**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

**Connie Speight,**

      *Plaintiff,*

**v.**                                                                    **Case No. 3:07-cv-382
Judge Thomas M. Rose**

**Communications Workers of America,**

      *Defendant.*

---

**ENTRY AND ORDER GRANTING DEFENDANT COMMUNICATION WORKERS OF AMERICA'S MOTION FOR SUMMARY JUDGMENT,** (DOC. 15)**, AND TERMINATING CASE.**

---

Pending before the Court is Communication Workers of America's Motion for Summary Judgment. Doc. 15. The motion arises in a case alleging that Defendant Communications Workers of America, ("CWA"), terminated Plaintiff Connie Speight not for cause, but for reasons related to a variety of discriminatory animi.

The parties dispute CWA's motive for terminating Speight's employment with CWA. Speight alleges she was terminated due her race, gender and age. CWA denies any discriminatory basis for their decision to fire Speight and counters that Speight was terminated due to internal findings of theft, abuse of sick leave and fraudulent submission of CWA documents.

Because Plaintiff has no evidence that could show an illegal discriminatory factor motivated Defendant's actions or that could prove Defendant's stated reasons for the termination were pretextual, the motion will be granted.

**I.   Background**

Plaintiff Connie Speight is a 57 year-old African-American female. She was employed by Communications Workers of America ("CWA") as a Staff Representative at the time of her termination on November 1, 2006. She was 57 at the time of her termination. Plaintiff was previously employed by the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, AFL-CIO ("IUE") which merged with the CWA in October 2000. Speight became a Staff Representative for the Union in Mississippi, where she then lived.

Staff Representatives assisted local unions in negotiating collective bargaining agreements, in processing employee grievances, and in other general functions.

CWA provides leased vehicles to its Staff Representatives for their use in performing their assigned duties. CWA also furnishes a CWA credit card to its staff Representatives for their use in purchasing gas and paying for maintenance and repair of their leased vehicle. Turchi Aff. at 2. Moreover, CWA has a written policy regarding employees' use of CWA-leased vehicles. The policy provides that the leased cars are for employees "who need them for conducting Union business." While personal errands to businesses located near home or office are allowed, "if the vehicle is to be used for any other purpose, for example, out of town trips, vacations, or other such personal use," permission must be obtained. Doc. 15-4 at 2.

As recently as December 8, 2004, Speight was informed of a CWA policy requiring her to submit quarterly personal milage reports and to report the milage related to any use of a leased

vehicle for personal purposes . Doc. 15-5. The CWA Fleet Car Policy state that when using a leased vehicle for purely personal purposes, a Staff Representative is to pay the cost of gasoline and any other expenses involved in such use rather than charging such expenses to their CWA credit card. Doc. 15-2 at 3.

CWA also has a written employee sick leave policy. This policy, which was in effect throughout Speight's employment by CWA, states that employees "on sick leave as a result of sickness or disability [are to] comply with any medical restrictions and...to remain in the immediate vicinity of their home during such period." Doc. 15-6 at 6, and Doc. 15-2 at 3-4.

CWA also has a policy regarding employee dishonesty. CWA's Employee Manual, in effect throughout Speight's employment with CWA, states that unauthorized use of CWA equipment or property for personal reasons, dishonesty, willful falsification or misrepresentation of work records, or lying about sick or personal leave, are all actions which, because of their seriousness, warrant immediate dismissal without prior warning. Doc. 15-2 at 4.

Speight was the junior by way of seniority of two Staff Representatives assigned to Mississippi. Due to a decline in IUE-CWA's membership in Mississippi in 2004, CWA declared Speight's position "surplus" and temporarily assigned her to service IUE-CWA locals in Pennsylvania. Later she was given a permanent assignment at Region 7 headquarters in Dayton. In April 2005, Denny Thomas, the Regional Director for Region 7, directed Speight to relocate her residence to the Dayton area. Speight complained of this decision to her union steward, stating that she preferred to commute from Mississippi to her assignments in Dayton.

About two months later, in June 2005, Speight requested approval for extended sick leave, claiming that she was "totally incapacitated" and unable to drive due to an injury to her left foot.

Her request was granted, and she was on sick leave from June 27, 2005 until November 14, 2005. Doc. 15-2 at 3.

The following year, Speight again requested sick leave for the same malady, and this was approved. It is unclear whether Speight claimed to be "totally incapacitated" during this second period. Speight was on leave this time from September 5, 2006 until September 24, 2006. *Id.*

In spite of her claim that she was "totally incapacitated" during her first leave of absence, Speight showed up at the Dayton office once during her 2005 sick leave. When the Regional Director noticed her, he relayed to her that as soon as she was well and back on duty, she needed to relocate to Dayton.

On September 18, 2006, a time when Speight was on her second sick leave, the Regional Director of ICE/CWA called Speight while she was on a Mississippi assignment assisting a union president for the Head Start Program and told her that management was allowing her to stay in Mississippi to continue working that assignment. Two days later, the Regional Director called Speight to instruct her to report to Dayton to assist at a political phone bank. Speight stated that she could not drive to Dayton due to her leg and foot being swollen. (Speight Affidavit at 6). The Regional Director told her to take care of herself and to report back to work when she was able.

The CWA changed its bookkeeping practices in September 2006. This month, for the first time, regional divisions received the reports of employee's quarterly reports regarding milage driven and employee's charges to CWA credit cards.

When Richard Chapman, the divisional assistant responsible for handling financial and administrative matters for the IUE-CWA Division reviewed the September 2006 report of CWA credit card purchases by IUE-CWA staff, he was surprised to see that Speight had used her CWA

credit card for multiple gas purchases during the month, since, to his knowledge, she was on sick leave during that time and should not have been engaged in any work-related activities that would justify use of her leased car or CWA credit card.

Concerned about this discrepancy, Chapman asked CWA's accounting department to provide a report of all of Speight's credit card purchases during her periods of sick leave in both 2005 and 2006. When he received the report, he discovered that Speight had made over 50 gas purchases totaling more than $1,800 while on sick leave in 2005 and 2006. Doc. 15-2 at 4-5.

Chapman then obtained copies of Speight's 2005 quarterly personal milage reports from CWA accounting, and upon reviewing these records, discovered that Speight had driven her car almost 12,000 miles while on sick leave between June 27 and November 14, 2005.

Chapman then checked the expense vouchers Speight had submitted in 2005 and 2006 to see if these reflected any work-related travel during the times she had reported herself to be totally incapacitated. Chapman discovered that Speight had no reimbursable travel expenses of any kind during these periods. Doc. 15-2, at 5. While the Court notes that Speight was apparently performing work in 2006 in Mississippi, Speight admits that she was not requested to perform any of her regular duties while on sick leave. She does, however, claim she was still requested to relocate to Dayton, Ohio. Doc. 15-13, at 23.

Chapman brought his discoveries concerning Speight's use of her leased vehicle and CWA credit card to the attention of IUE-CWA general Counsel Peter Mitchell. They contacted Speight's immediate supervisors during the periods she was on sick leave to determine whether they had assigned Speight any work during those periods. They informed Chapman that they had not. Doc. 15-2 at 5-6.

Chapman and Mitchell then reported what they had learned to IUE-CWA president Jim Clark. Clark directed them to inform Carmine Turchi, the Assistant to CWA Secretary-Treasurer who oversees the CWA leased car program and who was responsible for relations with CWA staff unions. *Id.* at 6.

Turchi determined that Speight had misrepresented her ability to work in order to secure approval of her sick leave requests in 2005 and 2006, that she had made extensive use of her CWA-leased vehicle for personal purposes without securing anyone's permission, and that, by charging her gasoline purchases for her personal use of her leased vehicle to her CWA-provided credit-card, she had misappropriated CWA funds for personal gain. He sent her a letter on October 2, 2006, informing her that she was suspended without pay, pending further investigation of the charges of misconduct against her. *Id.*

The letter stated:

> Dear Ms. Speight:
> 
> This is to notify you that effective October 6, 2006, you are suspended without pay, pending an investigation for the following dischargeable infractions:
> 
> 1. Theft. You have access to a CWA gasoline credit card to use with your CWA leased vehicle when performing union business. During your sick leave from June 27, 2005 through November 14, 2005, you made 44 purchases of gasoline totaling $1,485.57. During your current sick leave, starting September 5, 2006 through September 24, 2006, you made seven gasoline purchases totaling $217.32.
> 
> 2. Abuse of sick leave. During your current and 2005 sick leave you were placed on paid leave and excused from work on the basis of medical documentation that you were totally incapacitated due to a serious health condition. We understand a major component of this to be your inability to travel. During your sick leave, you entered milage figures at

> the time of your use of the union's credit card that reflect 11,947 miles driven. During your current sick leave, your figures since September 7 to September 24 reflect 1,834 miles driven. During these times your submissions of the CWA "Full Time Expense Vouchers" does not reflect any union activity to substantiate this driving. Further, your immediate supervisors during these periods report that they did not assign you any work during your leaves.
>
> 3. Fraudulent submission of CWA documents. As you know, every employee utilizing a car is required to document the miles that car is driven for personal use. On the basis of this form, CWA calculates the value of your personal use of the CWA lease vehicle so that it may fulfill its legal obligations to report that personal use for IRS and payroll accounting purposes. During 2005 your certified Reports of Personal Automobile Use numbers 2, 3, and 4 reflect only 272 miles' personal use and 18,736 miles of union use. These figures are not consistent with your work status during that period and resulted in fraudulent reporting by CWA.
>
> The above three issues are serious. Each constitutes a basis for your discharge. Unless you submit a legitimate explanation on each issue to me in writing no later than the close of business Friday, October 13, 2006, your employment will be terminated. If you believe that a meeting or conference call is necessary to document any explanation you have for your actions, please have your Union representative contact me to make appropriate arrangements. Of course, any such meeting would include your representative.
>
> Since you were scheduled to return to work in your home assignment of area in Dayton, Ohio on October 13, 2006, you should not report until this matter is resolved.

Doc. 15-8, at 2-3.

A telephone conference was held on October 12, 2006, between Chapman, Mitchell, Speight and two of Speight's union representatives. Speight claimed in the telephone conference that all of the driving she had done with her leased vehicle while on sick leave was in connection with relocating from Mississippi to Dayton as she had been directed to do before going on sick leave.

CWA noted, however, that she did not explain why she was able to drive so extensively during the times when she was claiming to be "totally incapacitated," under doctor's orders not to drive, and, therefore, unable to perform her regular Staff Representative duties. Nor did CWA find that she justified her use of her CWA gasoline credit card for gas purchases during her sick leaves. Doc. 15-4.

On November 1, 2006, the CWA notified Speight and her union representatives that her suspension was converted to a discharge. *Id.*

On November 15, 2006, the Staff Union filed a grievance on behalf of Speight, claiming that "CWA did not have just cause to discharge Connie Speight." *Id* at 7. When CWA denied the grievance, the Staff Union took the grievance to arbitration, as provided for by the Staff Union CBA. The arbitrator framed the question before him as "whether Grievant's termination was for just cause." Doc. 15-11 at 4. After a hearing, he determined "that Grievant has fatally violated the relationship of trust and confidence that must exist in her employment relationship with CWA, and this Arbitrator accordingly finds no reason to disturb the Employer's decision in this matter." *Id.* at 12.

On October 9, 2007, Speight filed the complaint in the instant action charging in an omnibus claim that "she has suffered discriminatory actions by defendant because of her race, gender and age" Doc. 2 at 5. "Said actions constitute discrimination under Title VII and ADEA." *Id.* Defendant has filed a motion for summary judgment on these undifferentiated claims, which is now ripe. Docs. 15, 18 and 20.

**II.     Summary Judgment Standard**

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250, 106 S. Ct. 2505 (quoting Fed. R. Civ. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). Rule 56 "requires the nonmoving

party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324, 106 S. Ct. 2548.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255, 106 S. Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Instead, a "court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties." *Id.;* Fed. R. Civ. P. 56(c). The analysis now turns to the merits of Defendant's motion for summary judgment.

**III.   Analysis**

Defendant Communications Workers of America asserts that summary judgment is warranted on all claims. Title VII prohibits employers from, among other things, discharging an employee because of that individual's race or sex.

Direct or circumstantial evidence may be used to establish an employee's claim of discrimination. Circumstantial evidence of discrimination is "analyzed under the burden-shifting

framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and later modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006).

The *McDonnell Douglas/Burdine* framework first requires that a plaintiff prove that (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by someone outside of her protected class or that other similarly situated employees outside of her protected class were treated better. See *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582-83 (6th Cir. 1992) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973).

Then,

> Once a *prima facie* case has been shown, the plaintiff is entitled to a presumption that the defendant discriminated against him or her in violation of Title VII. The defendant then bears the burden of production to put forth a legitimate, nondiscriminatory reason for the complained of adverse treatment. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant meets this burden, the presumption of discrimination created by the *prima facie* case falls away and the plaintiff then needs to show that the defendant's legitimate nondiscriminatory reason was a pretext for discrimination. Throughout this burden-shifting approach, the plaintiff continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate.

*Wright*, 455 F.3d at 706-07 (citations and internal quotation marks omitted).

Plaintiffs may establish pretext by showing that the proffered reason "(1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action." *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). A "plaintiff may

also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *White*, 533 F .3d at 393 (citation and internal quotation marks omitted). "If a plaintiff can show that the defendant's proffered, nondiscriminatory reason is pretextual, the trier of fact may infer discrimination. Nevertheless, the ultimate burden of proof to show discrimination remains on the plaintiff at all times. *Dews v. A.B. Dick Co.*,231 F.3d 1016, 1021 (6th Cir. 2000).

The analysis under the Age Discrimination in Employment Act, AEDA, for cases lacking in direct evidence is similar:

> Age discrimination cases under the ADEA are analyzed under the same framework as employment discrimination cases under Title VII. *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 538 (6th Cir. 2002) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). Proof in such cases proceeds in three stages. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 342 (6th Cir. 1997) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). First, "[i]n order to prove a *prima facie* case of discrimination, a plaintiff must show 1) that he is a member of a protected group, 2) that he was subject to an adverse employment decision, 3) that he was qualified for the position, and 4) that he was replaced by a person outside of the protected class." *Kline*, 128 F.3d at 349 (citing *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1246 (6th Cir. 1995)). In age discrimination cases, the protected class includes all workers at least 40 years old and the fourth element is modified to require replacement not by a person outside the protected class, but merely replacement by a significantly younger person. *Kline*, 128 F.3d at 352-53; *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311-13 (1996). Second, "[i]f the plaintiff establishes [a] *prima facie* case, the burden then shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Kline*, 128 F.3d at 342 (quoting *Burdine*, 450 U.S. at 252-53). Third, after the defendant has met this burden, "the plaintiff must produce sufficient evidence from which the jury may reasonably reject the

> employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994).

*Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003).

Plaintiff fails to adequately address Defendant's assertion that she has no direct evidence of discrimination, nor evidence sufficient to establish a *prima facie* case. It is undisputed that Plaintiff has not been replaced.

Indeed, Plaintiff inexplicably responds to the request for summary judgment on the age discrimination claim by asserting that a "similarly situated white female was treated differently." Even this assertion is without citation to the record. It appears that Plaintiff is referring to Ann Crump, a white female who is not similarly situated in that she never declared herself "totally incapacitated." Nor does it appear that she submitted milage reports unrelated to her work. But what this would have to do with Plaintiff's age discrimination claim is unclear. Even more perplexing to the Court is Plaintiff's decision to devote five pages of her brief to defending an non-existent claim for discrimination based upon disability.

Even if Plaintiff had established a *prima facie* case of discrimination, Plaintiff points the Court to no evidence that refutes Defendant's claim that Plaintiff was fired for abusing sick leave by driving extensively during the times when she was claiming to be "totally incapacitated," under doctor's orders not to drive, and for her unjustified use of her CWA gasoline credit card for gas purchases during her sick leaves.

However, Plaintiff refers in her response to the standards for evaluating a mixed-motive claim of discrimination.

> In [a mixed-motive] case, when a plaintiff alleges both legitimate and illegitimate reasons motivated the decision, Plaintiff "need only produce evidence sufficient to convince a jury that: (1) the defendant

> took an adverse employment action against the plaintiff; and (2) 'race, color, religion, sex, or national origin was a motivating factor' for the defendant's adverse employment action." White, 533 F.3d at 400 (quoting 42 U.S.C. § 2000e-2(m)).

*Lindsey v. Whirlpool Corp.*, 295 Fed. Appx. 758, 767, 2008 WL 4428416, 7 (6th Cir. 2008). Even here, however, while Plaintiff's "burden of producing some evidence in support of her mixed-motive claim is not onerous," Plaintiff must meet this minimal burden. *Id.*

Neither does Plaintiff put forward evidence that could prove an illegal reason motivated Defendant's decision.

Plaintiff makes little reference to the factual record in her opposition, but her background description of the case refers to affidavits that the Court notes fail to provide admissible evidence. A CWA Staff Representative, David Morgan, wrote, "In considering all of the circumstances in Connie Speight's termination, I believe that Connie Speight was terminated because of her race." Morgan aff. at 3. Speight affied, "I believe that I was fired because I am a black female; because I would not work a political campaign while on sick leave...." Speight aff. at 8. CWA Staff Representative Richard Martini affied, "It is my belief that if Connie Speight would have made that trip to Dayton one more time, she would not be terminated at this time." Martini aff. at 7. Connie Speight was terminated because of her race." None of these beliefs are substantiated by admissible evidence that would prove that race, gender or age was part of a mixture of motives behind CWA's decision.

## IV. Conclusion

Because Plaintiff has neither direct evidence, nor evidence to create a *prima facie* case of discrimination, nor evidence that might reveal Defendant's asserted reason for the termination as pretextual, nor evidence that illegal discriminatory animus even partially motivated her termination,

Defendant Communication Workers of America's Motion for Summary Judgment, doc. 16, is **GRANTED**. The Clerk is ordered to enter judgment in favor of Defendant and against Plaintiff on all claims. The captioned cause is hereby **TERMINATED** upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, April 1, 2009.

                                                         s/Thomas M. Rose
                                                   THOMAS M. ROSE
                                    UNITED STATES DISTRICT JUDGE